Victoria R. Pekerman, Esq. – I.D. No. 030421998
**SHAPIRO, CROLAND, REISER,**
**APFEL & DI IORIO, LLP**
411 Hackensack Avenue – 6th Floor
Hackensack, New Jersey 07601
Telephone:  (201) 488-3900
Facsimile    (201) 488-9481
*Attorneys for Defendants*

<div align="center">

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| DOOSAN MACHINE TOOLS AMERICA CORPORATION f/k/a DOOSAN INFRACORE AMERICA, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>CNC MACHINE SERVICES, INC., MARK HARRIS and DEANNA HARRIS,<br><br>       Defendants. | Civil Action No.:  2-18-cv-05754-CCC-CLW<br><br>**ANSWER OF DEFENDANTS AND COUNTERCLAIMS OF DEFENDANT CNC MACHINE SERVICES, INC.**<br><br>*Document Filed Electronically* |
| CNC MACHINES, SERVICES, INC., a Washington Corporation,<br><br>       Counterclaim Plaintiff,<br><br>       v.<br><br>DOOSAN MACHINE TOOLS AMERICA CORPORATION, a New York Corporation, formerly known as DOOSAN INFRACORE AMERICA, INC.<br><br>       Counterclaim Defendant. | |

The defendants answer the Complaint as follows.  Each numbered paragraph in this Answer corresponds to the paragraph with the same number in the Complaint.

716247.1

## THE PARTIES

1.  Admit Doosan is a New York corporation.  Deny for lack of information whether its principal place of business is as alleged.

2.  Admit.

3.  Admit.

4.  Admit.

## VENUE

3[sic]. Deny for lack of information

## FACTS COMMON TO ALL COUNTS

4[sic].  Deny for lack of information.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Admit.

10. Admit.

11. Admit.

12. Admit CNC gave notice of termination.  Deny they did so on the date alleged.

13. Deny.

14. Deny.

15. Deny.

16.  Admit that a credit was computed and applied to the alleged debt.  Deny that the balance claim is owed.

### AS TO THE FIRST COUNT

17.  In response to paragraph 17, Defendants incorporate their responses to the prior allegations.

18. Deny.

19. Deny.

20. Deny.

21. Deny.

22. Deny to the extent that it is alleged that damages are owed.

### AS TO THE SECOND COUNT

23.  In response to paragraph 23, Defendants' incorporate their responses to the prior allegations.

24. Deny.

25. Deny.

### AS TO THE THIRD COUNT

26.  In response to paragraph 26, Defendants' incorporate their responses to the prior allegations.

27. Admit.

28. Deny.

### AFFIRMATIVE DEFENSES

1.     Defendants breached no contractual duty owed to the Plaintiff

716489                                    3

2.      The Plaintiff's own material breaches of the contract bar recovery.

3.      Defendant CNC sustained damages as a result of the wrongful conduct of the Plaintiff that offset, in whole or in part, any damages to which the Plaintiff may be entitled in this matter.

4.      Plaintiff's claims are barred by the doctrine of estoppel.

5.      Plaintiff's claims are barred by the doctrine of unclean hands.

6.      Plaintiff's claims are barred by the statute of limitations.

7.      Plaintiff's own breach of duty of good faith and fair dealing bars the claim.

8.      Plaintiff waived the claims asserted in the Complaint.

WHEREFORE, Defendants demand judgment dismissing the Complaint with prejudice, together with reasonable attorneys' fees and costs of suit.

## COUNTERCLAIMS

Defendant CNC Machine Services, Inc., a Washington corporation, brings counterclaims against Doosan as follows:

## I. PARTIES

1.      The counterclaim plaintiff, CNC Machine Services, Inc. ("CNC"), a Washington corporation, is a distributor of computer-numerically-controlled machine tools.    CNC also provides repair and support service for the machine tools it sells.

2.      "Machine tools" are actually machines themselves.    (They will be referred to as "machines" from time to time in this pleading.)    They are used in the manufacture of a great variety of metal products, such as automotive and aviation parts, medical devices, and equipment

716489                                        4

for the oil and gas industry. The Doosan machine tools CNC sold ranged in price from approximately $80,000 to $250,000 per machine.

3.    The counterclaim defendant, Doosan Machine Tools America Corporation, is the successor of Doosan Infracore America, Inc., the company that dealt with CNC. It is incorporated in New York.

4.    Doosan Infracore America, Inc., was, and Doosan Machine Tools America Corporation is, a subsidiary of Doosan Infracore, a Korean company with annual sales in the billions of dollars.

5.    The residence of CNC Machines Services, Inc., as that term is defined in 28 U.S.C. §1332(c), is Washington. Accordingly, venue would have been proper in the United States District Court for the Western District of Washington, per 18 U.S.C. §1391(b), if this suit had been commenced there.

6.    There is diversity of citizenship between the plaintiff and the defendants and between the counterclaim plaintiffs and counterclaim defendant. The amount in controversy exceeds $75,000. Accordingly, the United States District Court for the Western District of Washington would have had subject matter jurisdiction, per 28 U.S.C.§1332, if this suit had been commenced there.

## II. THE CNC/DOOSAN DISTRIBUTORSHIP

7.    In 2006, Doosan Infracore America, Inc. ("Doosan") engaged CNC to be its distributor of machine tools in a territory comprised of Washington, Oregon, and parts of Idaho.

8.    The distributorship agreement prohibited CNC from selling machine tools manufactured by Doosan's competitors.

9.    The distributorship agreement required CNC to install the machines and also to service and repair them to enable Doosan to satisfy its warranties to customers.

10.    CNC's performance was exemplary.  It increased Doosan's sales in the territory from two machines per year to thirty-two machines per year.

11.    CNC enhanced Doosan's reputation, both in its own territory and, by its assistance to other distributors, elsewhere in United States, generating considerable goodwill for the Doosan brand.

12.    CNC received a special award from Doosan for its technical assistance to distributors in other parts of the United States.

13.    Doosan flew CNC's principal, Mark Harris, to Korea on multiple occasions to assist in research and development to improve Doosan's machine tools.

## IV. DOOSAN'S TERMINATION OF THE DISTRIBUTORSHIP

17.    In early 2015, Doosan decided to terminate its distributorship agreements with CNC and many other distributors throughout the United States.

18.    Doosan did not tell CNC of its decision at the time it was made and for many months thereafter.

19.    CNC learned of Doosan's decision from a third party in early July 2015.  It scrambled to find another line of machine tools to distribute and was able to do so.

20.    Having secured another line of machine tools, on July 24, 2015, CNC gave Doosan 30-days' notice of termination of the distributorship agreement.

21.    On August 19, 2015 Doosan gave notice of termination to most of its United States distributors.

22.    If CNC had not given its own notice of termination, Doosan would have given CNC notice of termination on August 19, 2015.

## IV. NAVY CONTRACT

23.    Beginning in 2012, CNC spent a considerable amount of time cultivating a relationship with the United States Defense Logistics Agency, the government agency responsible for buying machine tools for the U.S. Navy yard in Bremerton, Washington.

24.    A U.S. Navy representative attended the CNC open house in 2013 to see a demonstration of the Doosan machines.

25.    The Navy awarded CNC a contract for four Doosan machines in 2014.

26.    On March 15, 2015 CNC submitted a bid for a second Navy contract, this time for two machines.

27.    The Navy accepted CNC's bid.  On August 24, 2015, it sent CNC the purchase contract.  This was 31 days after CNC had given its notice of termination of the Doosan distributorship agreement.

28.    CNC asked Doosan to provide machines to fill the Navy's purchase order. Doosan refused.  Instead, Doosan completed the sale to the Navy one month later without compensating CNC for procuring it.

## III. DOOSAN'S FAILURE TO PAY FOR SERVICES

29.    As noted above, one of CNC's responsibilities under the distributorship agreement was support and repair services.

30.    Doosan did not pay CNC in full for the support and repair services it provided.

31.    The amount of Doosan's underpayment exceeds $100,000.

716489                                    7

## V. DOOSAN CAUSES CNC TO INCUR SUBSTANTIAL EXPENSES AFTER SECRETLY HAVING DECIDED TO TERMINATE ITS DISTRIBUTORSHIP

**A.  Expenses related to open house.**

32.     During its distributorship for Doosan, CNC held a summer open house each year to promote Doosan's machines.  Doosan supplied machines for display and demonstration at the event.

33.     In early 2015, CNC began making arrangements to put on the open house, as it had done in prior years.

34.     Doosan was aware of CNC's preparations for the event.

35.     Doosan was aware CNC had put on similar events each summer for the previous nine years.

36.     CNC's bought five machines from Doosan to install and display at its premises for the open house.  Installing the machines and readying them for demonstration was an expensive and time-consuming process, involving, among other things, using cranes to get the machines into CNC's building, leveling the machines, adding coolant and supplying electricity to each machine, programming them to perform the demonstrations, and buying materials for the demonstrations.

37.     CNC pre-sold four of these machines to customers who were not ready to take them, but who agreed to allow CNC to use them as floor models because CNC gave them certain credits.

38.     CNC incurred expenses promoting the event.

39.     While CNC was doing these things, Doosan had already secretly decided to terminate the distributorship.

716489                                         8

40.     When CNC learned through a third party that Doosan had decided to terminate its distributorship, the CNC-Doosan promotional event was canceled.

41.     In 2017 Doosan acknowledged that "there was not sufficient communication" about the termination of the distributorship agreement.   It gave CNC a credit of $8,728.93 against the amount it claimed to be due as "damages because of you preparing for an open house that did not happen."

42.     The damages incurred by CNC significantly exceed the amount credited by Doosan.

**B. Expenses for travel, lodging, and lost productivity.**

43.     In May 2015, after it had secretly decided to terminate the distributorship, Doosan directed CNC to send employees and customer representatives to Korea for meetings, causing CNC to incur transportation and lodging expenses, as well as lost productivity during its employees' absence.

44.     Also in May 2015, Doosan instructed CNC to send an employee for training about the repair of Doosan machines, causing expense to CNC and damages in the form of lost productivity during its employee's absence.   This training was utterly wasted, because Doosan has refused to sell parts to CNC since the distributorship ended.   As a result, CNC cannot even service the machines previously sold to its customers.

45.     Doosan ought to reimburse CNC for these and other expenses which it caused CNC to incur in furtherance of the distributorship, after Doosan had secretly decided to terminate the distributorship.

## VII.  <u>CAUSES OF ACTION</u>

### A.  Breach of Contract.

46.     Paragraphs 1 - 45 are incorporated by reference.

47.     Doosan breached its agreement to pay CNC in full for the service and repair of its machines, causing CNC damages.

### B.  Breach of Warranty.

48.     Paragraphs 1 - 47 are incorporated by reference.

49.     Many of the machines Doosan sold to CNC were defective.

50.     The defective machines were not merchantable, as that term is defined in the Uniform Commercial Code.

51.     The defective machines were not fit for the particular purposes for which they were intended.

52.     Doosan breached the implied warranties of merchantability and fitness for a particular purpose, causing damages to CNC.

### C.  Fraudulent Concealment.

53.     Paragraphs 1 - 52 are incorporated by reference.

58.     Doosan's decision to terminate CNC's distributorship was an important fact within Doosan's knowledge, but which was not knowable by CNC at a time when CNC incurred considerable expenses in furtherance of its distributorship relationship.

59.     Doosan had a duty to disclose its decision to terminate CNC's distributorship in order to avoid misleading CNC about (a) the feasibility of its 2015 annual summer house, (b) the

necessity of sending employees to Korea at CNC's expense, and (c) the necessity of sending an employee for training on the repair of Doosan machines.

60.    Doosan's fraudulently concealed its decision to terminate the distributorship, causing CNC damages.

**D. Estoppel.**

61.    Paragraphs 1 - 60 are incorporated by reference.

62.    By its behavior, Doosan led CNC to believe that it intended to cooperate with CNC in putting on its annual summer open house in 2015.

63.    CNC reasonably relied on Doosan's behavior in incurring the cost of preparing for and promoting the open house and suffered damages as a result.

64.    By its behavior, Doosan led CNC to believe that there was good reason to send its employees and customer representatives to Korea and its employee to Doosan's offices for training in 2015.  CNC reasonably relied on Doosan's behavior in doing so, causing damages.

**E. Quantum meruit/Implied contract**

65.    Paragraphs 1 - 64 are incorporated by reference.

66.    CNC is entitled to recover the reasonable value of the services it provided in procuring the U.S. Navy contract.

**F. Unjust Enrichment.**

67.    Paragraphs 1 - 66 are incorporated by reference.

68.    Doosan received a benefit from CNC's efforts to procure the U.S. Navy contract.

69.    It would be unjust if Doosan retained those benefits.

70.    Doosan should be required to pay CNC the benefits received as a result of CNC's efforts to win the U.S. Navy contract, including the value of subsequent orders reasonably expected to have followed upon the initial purchase.

**G. Tortious Interference with Business Expectancy.**

71.    Paragraphs 1 – 70 are incorporated by reference.

72.    CNC had a valid expectation of entering into a contract to supply machines for the U.S. Navy yard in Bremerton, Washington.

73.    Doosan was aware of that expectation.

74.    Doosan intentionally caused the U.S. Navy not to enter into the contract to buy machines from CNC.

75.    CNC was damaged as a result of Doosan's interference.

### VIII.  RELIEF REQUESTED

WHEREFORE, CNC requests that judgment in excess of $250,000 be entered against the counterclaim defendant for damages, attorney's fees to the extent recoverable under applicable law, prejudgment interest on liquidated amounts, taxable costs, and such other relief as is just under the circumstances.

SHAPIRO, CROLAND, REISER, APFEL & DI IORIO, LLP

By: _____
Victoria R. Pekerman, Esq.
411 Hackensack Avenue – 6th Floor
Hackensack, New Jersey 07601
Telephone:  (201) 488-3900
Facsimile    (201) 488-9481
*Attorneys for Defendants, CNC Machine Services, Inc., Mark Harris And Deanna Harris*

Dated:  April 30, 2018
Hackensack, NJ

## <u>CERTIFICATION OF SERVICE</u>

I certify in accordance with Fed.R.Civ.P. 5(b)(2)(E) that on April 30, 2018, a true and correct copy of the foregoing document was filed with the court electronically, and that all attorneys having appeared in this matter have been or will be served with notice of this filing at the email address they have registered with the court's CM/ECF system.

<div style="margin-left: 50%;">

**SHAPIRO, CROLAND, REISER,**
  **APFEL & DI IORIO, LLP**
Attorneys for Defendants

_____
Victoria R. Pekerman

</div>